IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE LUIS SANTANA<br><br>Petitioner,<br><br>v.<br><br>FRED FOULK, Warden,<br><br>Respondent. | Case No. 1:13-cv-02034 MJS (HC)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**ORDER GRANTING APPLICATION FOR LEAVE TO FILE OVERSIZED BRIEF (Doc. 35)** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, Fred Foulk, Warden of High Desert State Prison is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Mark A. Johnson of the office of the California Attorney General. Both parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c). (ECF Nos. 16, 24.)

I.    **PROCEDURAL BACKGROUND**

Petitioner is currently incarcerated pursuant to a judgment of the Superior Court of California, County of Kern, following his no contest pleas on July 19, 2010 of two counts of possession of methamphetamine, felon in possession of a firearm, possession of a loaded firearm in a vehicle, and felon in possession of ammunition. (Clerk's Tr. at 212-

1

1    13.) On September 10, 2010, the trial court sentenced Petitioner to a determinate term of

2    ten (10) years in state prison. Id.

3         Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

4    District. (Lodged Doc. 1.) On May 30, 2012, the court struck a duplicative enhancement

5    allegation, but otherwise affirmed the judgment. (Lodged Doc. 3.) Petitioner filed a

6    petition for review with the California Supreme Court on July 10, 2012. (Lodged Doc. 4.)

7    The Supreme Court summarily denied the petition on August 29, 2012. (Lodged Doc. 5.)

8    Petitioner did not seek collateral review of his convictions in the state courts.

9         Petitioner filed the instant federal habeas petition on December 2, 2013. (Pet.,

10   ECF No. 1.) On March 11, 2014, Petitioner filed an amended petition that serves as the

11   operative petition in this matter. (1st Am. Pet., ECF No. 12.) In the amended petition,

12   Petitioner presents three claims for relief: 1) that his due process rights were violated

13   due to the failure of the prosecution to disclose the reasons for police investigation and

14   arrest of Petitioner; 2) that his due process rights were violated by the court not providing

15   adequate time for defense counsel to investigate and argue his motion to withdraw his

16   plea; and 3) that trial counsel was ineffective in presenting his motion to withdraw the

17   plea. (1st Am. Pet.)

18        Respondent filed an answer to the petition on June 11, 2014, and Petitioner filed

19   a traverse to the answer on October 29, 2014. (Answer and Traverse, ECF Nos. 22, 34.)

20   With respect to his traverse, Petitioner filed an application for leave to file an oversized

21   brief, as the traverse is thirty-three (33) pages long. (ECF No. 35.) The application is

22   hereby GRANTED. Accordingly, the matter stands fully briefed and ready for

23   adjudication.

24   ///

25   ///

26   ///

27   ///

28   ///

II.    **STATEMENT OF THE FACTS**[1]

INTRODUCTION

On the evening of February 12, 2010, Officer Ryan Kroeker conducted a traffic stop of appellant/defendant Jose Luis Santana's vehicle in a motel parking lot, after Kroeker saw the vehicle traveling on the wrong side of the adjoining road. Defendant admitted he was on parole. As Kroeker attempted to conduct a parole search, defendant tried to escape, but he was restrained by Kroeker and his partner. Defendant was found in possession of over 100 grams of methamphetamine, a loaded firearm was in his vehicle, and his motel room contained packaging materials and ammunition.

Defendant was arrested and charged with multiple narcotics-related offenses. He filed a motion for disclosure of Officer Kroeker's confidential personnel records pursuant to <u>Pitchess v. Superior Court</u> (1974) 11 Cal.3d 531 (<u>Pitchess</u>), and claimed Kroeker's account of the traffic stop was false. The court conducted an in camera hearing and ordered disclosure of certain <u>Pitchess</u> information to defense counsel.

Defendant also filed a suppression motion and argued that Kroeker performed an illegal traffic stop and his account of the incident was not credible. During the suppression hearing, defense counsel extensively cross-examined Kroeker as to his account of the traffic stop, but she did not impeach Kroeker with any information obtained from the <u>Pitchess</u> motion. She did not introduce any evidence to impeach Kroeker's testimony that defendant said he was on parole. The court denied defendant's suppression motion and found the traffic stop was valid based on the officer's testimony that defendant had been driving on the wrong side of the road. Thereafter, defendant entered into a negotiated plea to the narcotics charges and was sentenced to 10 years.

During the course of the criminal proceedings, defendant was represented by two deputy public defenders. Leticia Perez represented him when the complaint was filed, when defendant rejected an initial plea offer of six years, and at the preliminary hearing. Janice Kim filed the <u>Pitchess</u> and suppression motions; represented him when he rejected a plea offer of nine years; was the subject of defendant's motion pursuant to <u>People v. Marsden</u> (1970) 2 Cal.3d 118 (<u>Marsden</u>); and she represented defendant when he entered into the negotiated plea for a term of 10 years. Defendant was represented by retained counsel, Arturo Revelo, at the sentencing hearing when he received the 10-year term.

On appeal, defendant contends that the superior court should have granted his motion to suppress the evidence, and asserts that Kroeker's testimony about the traffic stop was not credible.

Also on appeal, defendant asserts that Mr. Revelo, his retained attorney at the sentencing hearing, was prejudicially ineffective for failing

---

[1]The Fifth District Court of Appeal's summary of the facts in its May 30, 2012 opinion is presumed correct.  28 U.S.C. § 2254(e)(1).

to file a motion to withdraw his plea; defendant's three attorneys were prejudicially ineffective because they failed to realize he was charged with and admitted a duplicative fifth prior prison term enhancement; the sentencing court improperly prevented defendant and Mr. Revelo from pursuing a motion to withdraw his pleas and admissions; and the sentencing court should have asked defendant to explain why he wanted to file a motion to withdraw.

Defendant further requests this court to review the entirety of the Pitchess proceedings to determine if the superior court should have disclosed additional confidential records. We will strike defendant's admission to a duplicative enhancement and otherwise affirm.[Fn1]

> **FN1:** While the instant appeal was pending, defendant filed a petition for writ of habeas corpus with this court, In re Jose Santana (F063135). By separate order, we will deny defendant's writ petition without prejudice. In this appeal, however, we grant defendant's motion for judicial notice of the existence of the writ petition and the issues raised therein. In several footnotes in this opinion, information from the petition for writ of habeas corpus is summarized solely to provide a complete factual and legal history. Such information was not relied upon by this court to resolve any issues in this appeal. In this appeal, this court is also not deciding any issues in the writ.
>
> In his habeas petition, defendant contends Ms. Kim was prejudicially ineffective during the suppression hearing because she failed to investigate and introduce impeachment evidence against Officer Kroeker based on the Pitchess information that was disclosed to the defense. Defendant further contends that Ms. Perez and Ms. Kim were prejudicially ineffective for failing to accurately calculate his maximum possible exposure, which purportedly led him to turn down the prosecution's plea offers of six and nine years; Mr. Revelo was prejudicially ineffective for failing to discover various errors allegedly committed by Ms. Perez and Ms. Kim, and failing to renew his suppression motion; and all of his attorneys were ineffective for failing to discover, and permitting him to admit, the duplicative fifth prior prison term enhancement.

PART I

DEFENDANT'S ARREST AND THE CHARGES

We begin with Officer Kroeker's account of defendant's arrest, based on his police report which was made part of the appellate record during the Pitchess motion. According to the police report, Officers Kroeker and Holcomb were on patrol in a marked patrol car on the evening of February 12, 2010, on Olive Tree Court near Knudsen Drive in Kern County. The report states they were driving behind a Toyota Prius, and Kroeker noticed it was traveling on the wrong side of the road. Kroeker activated the patrol car's flashing lights to conduct a traffic stop. The Toyota pulled into the parking lot of Sleep Inn on Knudsen Drive.

4

The report states that there were two people in the Toyota: defendant was the driver and Breeann Oxford was the passenger. Officer Kroeker contacted defendant while Officer Holcombe spoke to Oxford. Kroeker noticed that defendant was very nervous. Kroeker asked defendant if he was on probation or parole, and defendant said he was on parole. Kroeker asked defendant to get out of the car for a parole search, and defendant complied. Kroeker ordered defendant to put his hands behind his head, and defendant turned and tried to run away. Kroeker held onto defendant as he tried to run. Defendant kept trying to reach inside his jacket for something, and kicked at Kroeker as he tried to escape. Defendant ignored Kroeker's orders to stop. Officer Holcombe used his baton and hit defendant twice on the left leg. Defendant went down, but he put his hand inside his jacket, and Kroeker thought he was reaching for a weapon. Defendant continued to resist. Holcombe again hit defendant's leg with his baton, and the officers were able to place defendant in handcuffs.

According to the police report, Kroeker searched defendant and found a bag, which contained approximately 111 grams of apparent methamphetamine, and a small bindle, which contained 0.7 grams of the same substance. Defendant had a room key for Sleep Inn. Officer Holcombe found a loaded .32-caliber semiautomatic pistol in the Toyota.

Kroeker advised defendant of the warnings pursuant to <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 (<u>Miranda</u>), and defendant agreed to answer questions. Defendant said he tried to escape because he had a large amount of methamphetamine. Defendant admitted the gun belonged to him.

Defendant said he was staying in a room at Sleep Inn, and the key belonged to his room. Kroeker and another officer entered the room with the key and found digital scales, packaging materials, a substance which appeared to be marijuana, and a large amount of ammunition.

Also according to the police report, Kroeker interviewed Oxford, defendant's passenger, after advising her of the Miranda warnings. Oxford said she was a stripper and defendant had just picked her up and hired her to perform a private dance for him. Defendant said they were going to his residence. Oxford said they drove to two unknown houses, defendant went inside for a few minutes, and then returned to the car. Oxford said she noticed the patrol car's flashing lights as defendant pulled into the motel's parking lot.

The complaint

Based on this incident, on February 18, 2010, a complaint was filed in the Superior Court of Kern County charging defendant with count I, possession of methamphetamine while in the possession of a loaded firearm (Health & Saf. Code, § 11370.1, subd. (a)); count II, possession of methamphetamine for sale with a prior conviction for possession of methamphetamine for sale (Health & Saf. Code, §§ 11378, 11370.2, subd. (c)); count III, felon in possession of a firearm (Pen. Code,[fn2] § 12021, subd. (a)(1)); count IV, possession of a loaded firearm in a vehicle (§ 12031, subd. (a)(2)(A)); count V, felon in possession of ammunition (§ 12316, subd. (b)(1)); and count VI, misdemeanor resisting arrest (§ 148, subd. (a)(1)).

5

FN2: All further statutory citations are to the Penal Code unless otherwise indicated.

As to counts I through V, it was alleged that defendant had served five prior prison terms (667.5, subd. (b)).[fn3]

FN3: As we will explain post, the parties agree [*9] that the complaint erroneously alleged that defendant had five prior prison term enhancements. Defendant had served only four prior prison terms, and allegation Nos. 4 and 5 were duplicative and based on the same prior conviction. This pleading error continued in both the information and amended information. Defendant admitted the duplicative fifth enhancement when he entered his pleas, but he was only sentenced based on four enhancements. As we will explain post, however, the error was not prejudicial and it did not affect defendant's sentence.

Also on February 18, 2010, defendant pleaded not guilty and denied the enhancements, and the court appointed the public defender's office to represent him.

Rejection of plea offer

On March 3, 2010, defendant appeared with Deputy Public Defender Leticia Perez for the pre-preliminary hearing. The court stated that defendant had received an offer to plead to count II, possession of methamphetamine for sale, and admit the Health and Safety Code section 11370.2 allegation, for a total of six years. Ms. Perez stated defendant had rejected the plea offer.

On March 4, 2010, the preliminary hearing was held and defendant was held to answer.

The information

On March 9, 2010, the information was filed which alleged the same six counts as in the complaint, and the same five prior prison term enhancements as to felony counts I through V.[fn4]In addition, the information further alleged as to the five felony counts that defendant was personally armed with a firearm during the commission of the offenses (§ 12022, subd. (c)).[fn5]

FN4: As in the complaint, the information erroneously alleged defendant had five prior prison term enhancements, and allegation Nos. 4 and 5 were duplicative and based on the same prior conviction.

FN5: In his writ petition, defendant contends that Ms. Perez was prejudicially ineffective during the initial plea negotiations because she failed to anticipate that he would later be charged with this special allegation for possession of a firearm, which would have increased his maximum exposure by five years. Defendant asserts he would have accepted the six-year offer if he had known his potential

sentence. At this court's invitation during informal briefing on the writ, Ms. Perez filed a responsive declaration regarding her alleged ineffectiveness, and declares that she advised defendant of his maximum exposure based on the charges filed at the time, and not based on potential or unfiled charges.

On March 15, 2010, defendant pleaded not guilty.

PART II

PRETRIAL MOTIONS

The Pitchess motion

On May 4, 2010, defendant filed a Pitchess motion for discovery of records regarding inmate or citizen complaints against Officers Kroeker and Holcombe. The motion was prepared by Deputy Public Defender Janice Kim.

Defendant's Pitchess motion was supported by Ms. Kim's declaration that Kroeker's police report contained material false statements about the facts and circumstances surrounding defendant's arrest. As to both officers, defendant sought discovery pertaining to acts constituting threats and excessive force. As to Kroeker, defendant requested discovery pertaining to acts constituting dishonesty and false statements.

According to Ms. Kim's declaration, defendant disputed Kroeker's entire account of the alleged traffic stop as stated in Kroeker's police report. Defendant claimed he was not driving in front of a patrol car or on the wrong side of the road, and that he was parked in Sleep Inn's parking lot when the officers initially contacted him.

According to Ms. Kim's declaration, defendant further claimed that he was sitting in his car when Kroeker ran up to the driver's side with his gun drawn, pointed his weapon at defendant, and yelled "'Where's the gun?'" Defendant said Kroeker never asked him about driving on the wrong side of the road, and defendant never said he was on parole.

Defendant further claimed that he never tried to run away or kick Kroeker. Instead, defendant got out of the car, and Kroeker pushed him to the ground. Holcombe hit defendant's legs with his baton numerous times, and defendant blacked out from the pain of the baton strikes. Defendant claimed he never admitted that he had a large amount of methamphetamine, made certain statements about the gun, said that he lived in the motel, or that the room key belonged to him.

The Bakersfield City Attorney's office, as custodian of records, filed opposition to defendant's Pitchess motion, but acknowledged that defendant had shown good cause for an in camera review of Kroeker's records for dishonesty and excessive force, and Holcombe's records for excessive force.

Defendant's motion to suppress

On May 5, 2010, defendant filed a motion to suppress pursuant to section 1538.5. The motion was prepared by Ms. Kim. Defendant argued the officers detained and searched him without a warrant and without lawful justification. Defendant sought to suppress all the contraband found by the officers when they searched the Toyota, defendant, and the motel room, and suppress defendant's statements at the scene. The prosecution filed opposition, and argued the officers had reasonable suspicion to conduct the traffic stop because they saw defendant driving on the wrong side of the road, and the searches were lawful pursuant to the terms of his parole.

The Pitchess hearing

On June 7, 2010, Judge Bush  conducted a hearing on defendant's Pitchess motion and advised the parties that he would conduct an in camera review of the confidential records for complaints about threats and excessive force as to Officers Kroeker and Holcomb, and for false reports as to Officer Kroeker.

Thereafter, the court conducted the confidential hearing, and ordered disclosure of certain information from Kroeker's files to the defense. The court granted defendant's motion to continue the suppression motion.

PART IV

THE SUPPRESSION HEARING

On July 1, 2010, Judge Bush, who heard defendant's Pitchess motion, conducted an evidentiary hearing on defendant's motion to suppress. Defendant appeared with Ms. Kim.

Officer Kroeker's Testimony

Officer Kroeker was the first witness for the prosecution. Kroeker testified that around 8:00 p.m. on February 12, 2010, he was on patrol with Officer Holcombe in the area of Olive Tree Court and Knudsen Drive. The Sleep Inn, Econo Lodge, and Motel 6 were all located at Knudsen Drive and Olive Tree Court.

Kroeker testified about his first observation of defendant's car: "Initially, I observed the vehicle as I was in the northern parking lot of the Econo Lodge. I noticed that it appeared to be traveling on the wrong side of the road from a distance. [¶] As I continued toward the vehicle, I noticed that it was, in fact, traveling on the—in the eastern portion of the roadway as it was traveling westbound, in violation of Vehicle Code [section] 21657." Kroeker testified there were no marked lines on the road, but defendant's car was "definitely on that wrong side," a violation of Vehicle Code section 21650.

Kroeker testified he conducted a traffic stop because defendant had been driving on the wrong side of the road. Kroeker contacted defendant in the driver's seat of the car, and defendant appeared very nervous. Kroeker testified that he asked  defendant if he was on probation or parole, and defendant said he was on parole.

Kroeker testified he asked defendant to get out of the car and put his hands behind his head. Defendant got out but refused to put his hands behind his head. Defendant started to run, Kroeker followed him, and Kroeker was "able to grab a hold of him." Defendant ignored Kroeker's orders to stop, and repeatedly tried to run away. Officer Holcombe used a baton to take defendant into custody.

Officer Kroeker testified he arrested defendant for resisting arrest. He searched defendant pursuant to the terms of his parole and also incident to his arrest. Kroeker found approximately 0.7 grams of methamphetamine in the right front coin pocket of defendant's pants. Defendant was wearing a large coat, and Kroeker found a bag with 111 grams of methamphetamine in an inside coat pocket. Defendant also had a cellphone, a small amount of cash, and a room key for Sleep Inn.

Officer Kroeker testified that Holcombe conducted a parole search of defendant's car, and found a loaded .32-caliber handgun in the center console.

Kroeker testified he asked defendant where he was staying. Defendant said he was staying in a room at the Sleep Inn, and the key belonged to that room. Kroeker testified he conducted a parole search of the motel room, and found two digital scales, packaging materials, a narcotics smoking pipe, and 46 live rounds of .22-caliber ammunition.

Defense counsel's cross-examination of Kroeker

On cross-examination, defense counsel asked Kroeker to explain where he was when he initially saw defendant's car. Kroeker said he and Holcombe had been on patrol, and they turned onto Knudsen Drive. They turned onto Olive Tree Court, and then turned into Econo Lodge's parking lot. Kroeker testified he was in the northern parking lot of the Econo Lodge when he first saw defendant's car.

Kroeker testified that when he first saw defendant's car, it had "turned onto Olive Tree Court from Knudsen," and it was driving westbound "partially in the eastbound lane," which is "what caught my attention." Defendant's car was the only vehicle traveling on the road. Kroeker's patrol car was about a half-mile away in the Econo Lodge's northern parking lot when he first saw defendant's car traveling on Olive Tree Court. Kroeker testified he next saw defendant's car turn from Olive Tree Court into Sleep Inn's parking lot.

Also on cross-examination, defense counsel asked Kroeker if he contacted any member of Sleep Inn staff prior to conducting the traffic stop of defendant's car. Kroeker replied, "I don't recall if I had or not." Defense counsel asked Kroker if he or Holcombe contacted the motel staff to ask about defendant. Kroeker replied, "I don't recall if we had gone in prior. I know we went in after. I don't recall if we went in beforehand."

Defense counsel asked Kroeker if he was familiar with defendant prior to arresting him that night. The prosecutor objected to the question as beyond the scope of the suppression motion. Defense counsel replied the question was relevant because defendant was going to argue the traffic stop was pretextual. The court overruled the prosecutor's objection and directed Kroeker to answer the question.

Instead of answering the question, Kroeker advised the court that he was claiming a privilege pursuant to Evidence Code section 1041. Defense counsel asked the court to conduct an in camera hearing with Kroeker. The court agreed and cleared the courtroom.

Thereafter, the court conducted an in camera hearing. After completion of the hearing, the court recalled the parties into the courtroom. The court advised the parties that it was going to uphold the privilege. Defense counsel resumed cross-examination of Officer Kroeker, and asked whether the only reason he stopped defendant's car was because it was traveling in the wrong lane. Kroeker said yes. Defense counsel asked if he had only contacted Sleep Inn staff on February 12, 2012. Kroeker said he did not recall if he had gone to the motel during the week prior to February 12, 2012. Kroeker replied: "I don't believe so. It's been several months now. I really don't recall."

Defense counsel asked Kroeker if he recognized defendant when he initially approached the car. Kroeker said no. Kroeker admitted he already had defendant's booking photograph, but based on the way defendant looked that night, "it didn't stick out in my head when I initially contacted him, no, until he told me his name."

Defense counsel asked a series of questions and the court overruled the prosecutor's repeated objections: "[DEFENSE COUNSEL]: So on February 12, were you in that vicinity where you were—you said that you were in the parking lot of the Econo Lodge. Were you looking for [defendant]? [¶] ... [¶]

"[KROKER]: Yes.

"Q. You knew what  vehicle he would be driving, correct? [¶] ... [¶]

"[KROEKER]: I had a description of the vehicle."

Defense counsel asked Kroeker why he was looking for defendant. The prosecutor objected, Kroeker claimed the privilege, and the court sustained the privilege based on the prior in camera ruling.

Defense counsel pointed out that in his report, Kroeker wrote that he was traveling from Knudsen Drive to Olive Tree Court when he saw defendant's car. Counsel asked Kroeker if he failed to indicate in his report that he was in the Econo Lodge's parking lot when he first saw defendant's car, and Kroeker said yes.

Breeann Oxford

Breeann Oxford was called as a defense witness. She had been in the car with defendant when he was searched and arrested by Officer Kroeker. Oxford testified she was a dancer and worked for Top Notch Adult Entertainment. Defendant had hired Oxford to perform a lap dance and a show for him. She thought that she was going to perform for defendant at Sleep Inn.

Oxford testified that she first noticed the police car when defendant was driving on Knudsen and turning into Sleep Inn. Defendant was driving

10

northbound on Knudsen, while the patrol car was driving southbound on Knudsen, in front of defendant's car and driving toward them.

Oxford testified that defendant pulled into Sleep Inn's parking lot, parked, and turned off the car. After they had been parked for about two minutes, two officers approached the driver's side window of the car. The officers asked defendant for his name and to get out of the car. A few minutes later, the officers asked Oxford some questions. Several more patrol cars arrived about 10 minutes later.

Oxford testified she never noticed any lights from the patrol car. She was confronted with her prior statement to the officers, that she saw the patrol car's lights as they turned into the motel's parking lot. Oxford said that she never made that statement, and she never saw any flashing lights that night.

Oxford did not dispute Officer Kroeker's testimony that defendant said he was on parole.

Noe Esquivel

Defense counsel called Noe Esquivel as a witness, who testified that on the night of February 12, 2010, he was parked on the side of Olive Tree Court, in front of Econo Lodge. He was with his girlfriend, Lorena Chavez, and they were waiting to pick up some friends. He did not notice any police cars when he arrived in that location, and he did not see any moving vehicles.

Esquivel testified that a couple of minutes after he parked, he noticed a patrol car was behind him. The patrol car drove past Esquivel's parked vehicle, and then it circled Econo Lodge, drove behind it, and returned to the front. Esquivel testified the patrol car then drove across the street and into the parking lot of Sleep Inn. The patrol car entered Sleep Inn's parking lot from Olive Tree Court.

Esquivel testified he was concerned about the patrol car and kept watching it because he didn't have a driver's license. Esquivel testified the patrol car parked, the officer got out of the vehicle, and he approached a gray car in Sleep Inn's parking lot. Esquivel admitted he did not notice the gray car until the officer approached it.

Esquivel testified he stayed in his own car during the entire incident, and he was about 40 to 50 yards from the parked car. Esquivel testified that he never heard a siren or saw flashing lights to pull over the car that the officer approached. He thought the car had already been parked because he never noticed any movement in Sleep Inn's parking lot. "The only movement I followed was the officer when he crossed over to the Econo Lodge. That's the only moving vehicle that I seen that night.""THE COURT: ... Are you saying that the patrol car never turned on its red lights?

"[ESQUIVEL]: There was no sign of a car getting pulled over.

"THE COURT: So the police officer simply parked his vehicle and walked up to the gray car?

11

"[ESQUIVEL]: Right."

Esquivel thought the officer reached for his hip as he approached the car. He heard the officer tell the vehicle's occupant to get out. Esquivel later noticed another officer approach the car. Several other patrol cars arrived within two minutes.

Esquivel testified he did not know defendant or Breeann Oxford. He got involved in this case because he had been picking up some girls that night. The girls were dancers and strippers, and Esquivel knew them as "Sherry" and "Lady Bug." Esquivel testified the girls knew defendant and heard about his arrest. They told Esquivel about the incident. "And then what they told me was a lot different from what I'd seen."

Esquivel admitted that in 2005, he had felony convictions for violating section 496, subdivision (a), receiving stolen property, and Vehicle Code section 10851, unlawfully taking or driving a vehicle.

Lorena Chavez

Lorena Chavez was called as a defense witness, and testified she was in Esquivel's car that night. They were parked on the side of Olive Tree Court, by Econo Lodge, when she saw a patrol car on Knudsen. The patrol car drove into Econo Lodge's parking lot, drove around and behind Econo Lodge, returned to the front, and then crossed the street to Sleep Inn.

Chavez testified that she noticed a gray vehicle parked across the street in Sleep Inn's parking lot. Chavez testified the gray vehicle was already parked in Sleep Inn's parking lot when she first saw the patrol car. She never saw any vehicle move or drive through Sleep Inn's parking lot. Chavez never saw any flashing lights or heard a siren from the patrol car, and she never saw the patrol car follow the gray car.

Chavez admitted that her driver's license was suspended, and that she was convicted of receiving stolen property in 2004 and using force on officers in 2005. She did not know defendant and had no relationship with him. She got involved in the case when she was contacted by Esquivel's friends, known as Sherry and Lady Bug.

Maria Arismendi

Maria Arismendi, the desk clerk at Sleep Inn, testified for the defense. Arismendi testified that sometime in February 2012, police officers contacted her at the motel about defendant and said they were looking for him. They arrived around 5:00 p.m. or 6:00 p.m. She could not recall if they showed her a photograph of defendant.

Arismendi testified that she told the officers that she had seen defendant once or twice at the motel. Arismendi told the officers that defendant once entered the office and asked for change for the vending machine, and he said that he was staying at the motel. She did not tell the officers which room defendant was staying in. Arismendi also thought she went to high school with defendant, but they had not been friends.

Arismendi reviewed the motel's records and determined defendant

12

was not registered as a guest at the motel. Defendant was staying in a room that had been rented by Christina Lascano from February 11 to 13, 2010.

Arismendi was asked if she recognized Officer Kroeker, who was sitting in the courtroom. Arismendi said she did not remember, but she thought the officer would remember if he spoke to her.

Officer Kroeker's additional testimony

Officer Kroeker was recalled as a witness, and testified that he never activated the patrol car's siren that night, and he only activated the red lights on the side of the patrol car.

Kroeker testified that he never saw or spoke to Esquivel and Chavez that night. Based on their descriptions of where they were parked, Kroeker believed they would not have been able to see the red lights on his patrol car when they were activated because "our red lights were forward facing lights," based on the position of the flashing-light bar.

Kroeker testified that he activated the patrol car's red lights when he was on Olive Tree Court. Based on the testimony of Esquivel and Chavez, they would have been to the right of the patrol car. Kroeker entered Sleep Inn's parking lot from the entrance on Olive Tree Court and not from Knudsen. When Kroeker activated the red lights, defendant's car was pulling into Sleep Inn's parking lot from the Olive Tree Court entrance.

"[DEFENSE COUNSEL]: So you were never actually behind that vehicle, correct?

"A. Yes, I was momentarily because I pulled out onto Olive Tree Court. It was making a left turn into the parking lot. I wasn't directly behind it. I was behind it from a distance, but I was behind it.

"Q. About how far away?

"A. Well, as I pulled out on Olive Tree Court from the north parking lot of the Econo Lodge, the vehicle was getting ready to make its descent. That looks like it's probably—I don't know—30 or 40 yards, roughly. I was behind it and then I accelerated. I was able to catch up to the vehicle as it was stopping in the parking stall.

"Q. How long did that take you to travel?

"A. A few seconds. Five seconds, maybe."

Kroeker testified he interviewed Oxford that night, and she said that she saw the patrol car's lights as defendant pulled into Sleep Inn's parking lot.

The court asked Kroeker how he found out defendant was on parole. Kroeker testified he contacted defendant from the driver's side of the car, he noticed defendant was nervous, and he asked defendant if he was on parole.[fn6]

**FN6**: Defendant did not introduce any evidence at the

suppression hearing to refute Officer Kroeker's testimony that defendant said he was on parole.

The parties' arguments

At the conclusion of the evidence, the prosecutor argued the officers conducted a valid traffic stop because defendant violated the Vehicle Code by driving on the wrong side of the road, and the searches of defendant, his car, and his room were valid parole searches.

Defense counsel argued the officers were looking for defendant because they had contacted the motel clerk to ask about his whereabouts. "They were looking for him. This was a pretext contact. There was no [probable cause], there was no driving on the wrong side of the road," and no justification for stop of defendant's car.

The prosecutor replied that Kroeker saw defendant's car driving the wrong way when Kroeker pulled onto Olive Tree Court. As for the motel clerk, she did not remember speaking to Kroeker, and she was not specific as to the time or day when officers contacted her. The prosecutor also argued that Oxford had given different stories about the incident, and Esquivel and Chavez were not credible because they had prior convictions of moral turpitude and they gave inconsistent statements.

The court's ruling

The court denied defendant's motion to suppress. "The officer's testimony was very straightforward that he saw the traffic violation.

"When you look at or consider Ms. Oxford's testimony, she had been picked up by the defendant, apparently, because she said they were going to there, I believe was her words, something along those lines, to have a lap dance. I assume she didn't mean inside the car. Yet the other folks never saw this car moving, which means that when you put Oxford's testimony together with the other two, it doesn't make sense because the other folks said that this gray car never moved, and Oxford said we were moving, saw the patrol car moving.

"Why were they just sitting there in that car? It doesn't make sense why they would have been sitting in that car. They would have gotten out and headed towards the room to have a lap dance. It doesn't make sense.

"There was a traffic violation, parole search. Motion denied."

PART V

REJECTION OF THE PLEA OFFER AND THE MARSDEN HEARING

Rejection of second plea offer

On July 2, 2010, Judge Bush conducted a trial confirmation hearing. Defendant appeared with Ms. Kim. The court stated that defendant's maximum exposure was 15 years, and he had received a plea offer for nine years. Ms. Kim stated that they wanted to confirm for trial.

The court asked defendant if he understood that if he pleaded guilty

or no contest, he would get nine years in prison. Defendant said he understood. The court further advised defendant that if he went to trial and was convicted of all charges, and all special allegations were found true, he could get a maximum term of 15 years. Defendant said he understood. The court asked if he still wanted to go to trial, and defendant said yes.[fn7]

> **FN7**: In his writ petition, defendant argues Ms. Kim was prejudicially ineffective because she failed to properly calculate his maximum possible exposure, since she allegedly did not realize that he was charged with a duplicative fifth prior prison term enhancement. At this court's invitation during informal briefing on the writ, Ms. Kim filed a declaration regarding her alleged ineffectiveness, and declares that while she failed to notice the pleading error in the information, she always knew that defendant only had four prior prison term enhancements, all her plea negotiations with the prosecution were based on the existence of four and not five enhancements, and she advised defendant that his maximum possible exposure was 18 years 8 months if he was convicted of all charges and enhancements. Ms. Kim further declares that defendant wanted a plea bargain of less than the six years which had been originally offered, the prosecution offered nine years after the suppression motion was denied, defendant refused and said it was too much time, he demanded a counteroffer of three years, and the prosecution rejected it.

The Marsden hearing

On July 19, 2010, an amended information was filed against defendant, which was identical to the prior information. The amended pleading corrected the dates of his prior convictions in support of the prior prison term enhancements.[fn8]

> **FN8**: The amended pleading corrected the dates of the fourth and fifth prior prison term enhancements, but both allegations were again duplicative and based on the same prior conviction, which had been corrected to February 10, 2006.

Also on July 19, 2010, Judge Lewis called the matter for a jury trial. Defendant appeared with Ms. Kim and made a Marsden motion to discharge her. Judge Lewis transferred the matter to Judge Wallace to conduct a Marsden hearing.

Judge Wallace presided over the Marsden hearing and asked defendant to explain why he was dissatisfied with Ms. Kim. Defendant complained that there were "a lot of lies that the police are putting forward" about his case. Defendant said he had asked Ms. Kim to request all the police reports from his arrest, because the police falsely claimed that they stopped his car, but he was never stopped. He also wanted the surveillance videos "from the place where I was arrested," which would "prove everything and would prove that I was never stopped," and to find out why the police drew their guns when they arrested him.

15

Defendant complained Ms. Kim never introduced anything against the arresting officer even though he had a record of false reports. Defendant said that they got the personnel records and there were 12 complaints against the officers who arrested him. Defendant complained Ms. Kim never told the court about this evidence.

The court asked Ms. Kim to respond. Ms. Kim stated the defense investigator went to the arrest scene, contacted neighboring businesses, and could not find any surveillance tapes that showed the incident.

As for the Pitchess motion, Ms. Kim explained the court granted the Pitchess motion and she received certain information, but "my investigator wasn't able to—there [were] no witnesses that we had been able to get in contact with. So nothing came out of the Pitchess motion as far as our investigation." Ms. Kim further explained: "And [defendant] mentioned something about how I had never brought up some of the complaints from the Pitchess motion at the time of a prior hearing. [¶] I believe that prior hearing was a suppression motion, and at that time there was no—there were no witnesses that came out of the Pitchess motion that we thought we were able to get in contact with, so none of those Pitchess witnesses were produced at the time of the suppression motion. So I could not bring up the fact that these complaints existed without the witnesses being there at the suppression motion."[fn9]

> **FN9**: In defendant's writ petition, he argues Ms. Kim was prejudicially ineffective for failing to introduce any evidence which had been disclosed pursuant to Pitchess, to impeach Kroeker's credibility at the suppression hearing. In support of this argument, he has submitted declarations from three people who had filed the disclosed internal affairs complaints against Kroeker, and they declared that they could have been easily located and would have testified against Kroeker. In Ms. Kim's responsive declaration to the writ's allegations, she declares that she is "quite certain" that she checked the criminal records of these same three people, they had criminal records, and they would not have been good witnesses.

Ms. Kim also addressed the suppression motion. "At the suppression motion I did call several witnesses, two witnesses; Noe Escoville and Lorena Chavez were witnesses that [defendant] informed me. My investigator was also able to find a witness, the motel clerk from the motel that [defendant] was arrested in front of. And I did call that person as a witness.

"The suppression motion, the issue was basically a stop, whether the officers actually stopped [defendant] based on a traffic violation. And the traffic violation was basically [defendant] crossing the lane of travel and going into the opposite traffic. And that was pretty much the issue at the suppression motion.

"So [defendant] mentioned something about me not bringing up the fact that officers pulling out their weapons to [defendant], but that wasn't an issue at the time of the suppression motion, so that wasn't brought up."

The court denied defendant's Marsden motion and found Ms. Kim

16

was doing "a good journeyman's job in representing you.""There is a finite issue with the suppression motion that makes certain evidence that might be relevant for trial, not relevant for the suppression motion. And again, it is best for the defense not to disclose any more than is absolutely necessary in order to properly present evidence on the issues that are before the court."

PART VI

DEFENDANT'S  PLEAS AND RETENTION OF MR. REVELO

Defendant's no contest pleas

Also on July 19, 2010, after defendant's <u>Marsden</u> motion was denied, Judge Wallace  reconvened the matter for the scheduled jury trial. Defendant appeared with Ms. Kim.

The court stated that the parties had met in chambers and agreed to a disposition, that defendant would plead no contest to all charges and admit all special allegations as set forth in the amended information, with an indicated 10-year lid. Ms. Kim and the prosecutor agreed with the court's statement, but the prosecutor stated that the People objected to the proposed disposition.

The court asked defendant if "that [is] what you want to do," and defendant said yes. The court advised defendant of his constitutional rights, and defendant stated that he understood and waived his rights. Ms. Kim stipulated to the factual basis for the pleas. The court stated: "I know you have had an opportunity to discuss this matter at some length with Ms. Kim," and asked if he had any further questions for the court or Ms. Kim. Defendant said no.

Defendant pleaded no contest to count I through VI, and admitted all the special allegations, as set forth in the amended information.[fn10] The court set the sentencing hearing for August 2010.

> **FN10**: In doing so, defendant admitted the duplicative fifth prior prison term enhancements.

Relief of Ms. Kim and retention of Mr. Revelo

On August 11, 2010, Ms. Kim moved to continue the sentencing hearing.

On August 13, 2010, Judge Wallace convened the scheduled sentencing hearing. Defendant appeared with both Ms. Kim and attorney Arturo Revelo. The instant record does not contain a reporter's transcript for this hearing. According to the minute order, however, the court granted defendant's request to relieve Ms. Kim, and acknowledged that defendant had retained Mr. Revelo to represent him. The court granted defendant's pending motion to continue the sentencing hearing.

PART VII

DEFENDANT'S REQUEST TO WITHDRAW HIS PLEA & THE SENTENCING HEARING

The probation report

According to the probation report, defendant was found in possession of 112.75 grams of a substance containing methamphetamine. Defendant was statutorily ineligible for probation, except in an unusual case, because he had previously been convicted more than twice of a felony. (§ 1203, subd. (e)(4).) The probation report further stated that even if he was eligible for probation, he would be unsuitable because of his lengthy criminal history, his four prior prison terms, he was on parole when he committed the crime, and he admitted to officers that he was selling methamphetamine to make his income.

The probation report stated there were no mitigating circumstances and four aggravating circumstances: his prior convictions were numerous; the crime involved a large amount of narcotics; he was on probation and parole when he committed the crime; and his prior performance on probation and parole was not satisfactory.

The probation report recommended an aggregate term of 10 years, based on the upper term of three years for count II, a consecutive term of three years for the firearm allegation, and four consecutive one-year terms for the prior prison term enhancements, with the terms for the remaining counts stayed pursuant to section 654.[fn11]

> **FN11**: The probation report stated that defendant only had four prior prison terms, but did not state that the amended information erroneously included a duplicative fifth enhancement, or that defendant admitted the fifth enhancement.

Defendant's request to withdraw his plea

On September 10, 2010, Judge Wallace convened the sentencing hearing. Defendant appeared with Mr. Revelo. Mr. Revelo stated that defendant wanted to file a motion to withdraw his plea because of "the number of years he's getting as a sentence." The court said the number of years was not a basis to move to withdraw the plea because "that was the plea bargain."

Mr. Revelo stated that defendant had just told him about this matter shortly before the hearing. Mr. Revelo asked for some time to consult with defendant so he could determine if there were legal grounds for a motion to withdraw. The court agreed and trailed the matter so Mr. Revelo could consult with defendant.

After a recess, the court reconvened the sentencing hearing. Mr. Revelo advised the court that there was "no legal [cause] basis for withdrawing the plea," and agreed to proceed with the sentencing hearing.[fn12]

> **FN12**: As we will discuss post, defendant argues on appeal that the sentencing court improperly asked Mr. Revelo to explain the basis for a motion to withdraw, Mr. Revelo was prejudicially ineffective for failing to make the motion based on the duplicative fifth enhancement, and the court was

required to ask defendant about the reason he wanted to file a motion to withdraw. In his writ petition, defendant argues Mr. Revelo was prejudicially ineffective for failing to investigate the alleged ineffectiveness of Ms. Kim and Ms. Perez, as the basis for a motion to withdraw.

Sentencing

The court reviewed the probation report and asked Mr. Revelo if he had any comments. Mr. Revelo replied that he would submit the matter on the probation report and the plea bargain. The prosecutor stated the plea bargain was a "very fair and generous offer" of 10 years, and argued that defendant should receive the entire 10 years because of his lengthy criminal history and conduct in this case.

The court found there were no unusual circumstances to justify a grant of probation, and defendant would be ineligible because of his prior criminal history and failure to comply with the terms of probation. The court found the aggravating circumstances were defendant's prior numerous convictions, the large amount of narcotics involved in this case, defendant was on both probation and parole when he committed the offenses, and his prior performance on probation and parole had been unsatisfactory. The only possible mitigating factor was that defendant entered a plea and admitted wrongdoing. The court found the upper term was justified and consistent with the plea bargain.

The court sentenced appellant to an aggregate term of 10 years, based on the upper term of three years for count II, a consecutive term of three years for the firearm enhancement, and four one-year terms for four prior prison term enhancements. The court imposed and stayed the terms for the other offenses.[fn13]

> **FN13**: In his writ petition, defendant argues Mr. Revelo was prejudicially ineffective for failing to introduce mitigating evidence at the sentencing hearing about his good character, and failing to argue for a lesser term.

Notice of appeal/certificate of probable cause

On September 15, 2010, defendant filed a timely notice of appeal, and the court granted his request for a certificate of probable cause as to the denial of his suppression motion.

People v. Santana, 2012 Cal. App. Unpub. LEXIS 4073, 1-39 (May 30, 2012).

## III.   **GOVERNING LAW**

### A.    **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

1   suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

2   conviction challenged arises out of the Kern County Superior Court, which is located

3   within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

4   has jurisdiction over the action.

5          **B.**      <u>**Legal Standard of Review**</u>

6          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

7   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

8   filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

9   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

10  the AEDPA; thus, it is governed by its provisions.

11         Under AEDPA, an application for a writ of habeas corpus by a person in custody

12  under a judgment of a state court may be granted only for violations of the Constitution

13  or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

14  7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

15  state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

20  28 U.S.C. § 2254(d).

21                  1.      <u>Contrary to or an Unreasonable Application of Federal Law</u>

22         A state court decision is "contrary to" federal law if it "applies a rule that

23  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

24  that are materially indistinguishable from" a Supreme Court case, yet reaches a different

25  result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.

26  "AEDPA does not require state and federal courts to wait for some nearly identical

27  factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

28  even a general standard may be applied in an unreasonable manner" <u>Panetti v.</u>

1   *Quarterman*, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

2   "clearly established Federal law" requirement "does not demand more than a 'principle'

3   or 'general standard.'" *Musladin v. Lamarque*, 555 F.3d 830, 839 (2009).  For a state

4   decision to be an unreasonable application of clearly established federal law under §

5   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

6   (or principles) to the issue before the state court.  *Lockyer v. Andrade*, 538 U.S. 63, 70-

7   71 (2003).  A state court decision will involve an "unreasonable application of" federal

8   law only if it is "objectively unreasonable."  *Id.* at 75-76, quoting *Williams*, 529 U.S. at

9   409-10; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). In *Harrington v. Richter*, the

10  Court further stresses that "an *unreasonable* application of federal law is different from

11  an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing *Williams*, 529

12  U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

13  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

14  correctness of the state court's decision."  *Id.* at 786 (citing *Yarborough v. Alvarado*, 541

15  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

16  have in reading outcomes in case-by-case determinations."  *Id.*; *Renico v. Lett*, 130 S.

17  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

18  Federal law for a state court to decline to apply a specific legal rule that has not been

19  squarely established by this Court."  *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419

20  (2009), quoted by *Richter*, 131 S. Ct. at 786.

21                    2.    Review of State Decisions

22        "Where there has been one reasoned state judgment rejecting a federal claim,

23  later unexplained orders upholding that judgment or rejecting the claim rest on the same

24  grounds." *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  This is referred to as the

25  "look through" presumption.  *Id.* at 804; *Plascencia v. Alameida*, 467 F.3d 1190, 1198

26  (9th Cir. 2006).   Determining whether a state court's decision resulted from an

27  unreasonable legal or factual conclusion, "does not require that there be an opinion from

28  the state court explaining the state court's reasoning." *Richter*, 131 S. Ct. at 784-85.

"Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3.   Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's

1  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

2  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

3  state court recognized the error and reviewed it for harmlessness).  Some constitutional

4  errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v.

5  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

6  (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

7  assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

8  Strickland prejudice standard is applied and courts do not engage in a separate analysis

9  applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

10  v. Lamarque, 555 F.3d at 834.

11  **IV.**   **REVIEW OF PETITION**

12       **A.**   **Claim One – Failure to Exclude Evidence**

13       Petitioner contends the trial court denied his rights to due process, confrontation,

14  and counsel by permitting the arresting officer to avoid disclosing information provided

15  him by a confidential informant, on which information the officer relied in arresting

16  Petitioner. (Am. Pet. at 5.)

17            1.   State Court Decision

18       Petitioner presented his claim in his direct appeal to the California Court of

19  Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

20  Court of Appeal and summarily denied in subsequent petition for review by the California

21  Supreme Court. (See Lodged Docs. 3, 5.) Since the California Supreme Court denied

22  the petition in a summary manner, this Court "looks through" the decisions and

23  presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last

24  state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

25  804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption that

26  higher court agrees with lower court's reasoning where former affirms latter without

27  discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000)

28  (holding federal courts look to last reasoned state court opinion in determining whether

state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Court of Appeal explained that:

I.  The court properly denied defendant's motion to suppress

Defendant contends the court erroneously denied his motion to suppress because he was illegally detained during the traffic stop. Defendant argues there is no evidence that he violated the Vehicle Code because Officer Kroeker's testimony was not credible and he gave inconsistent statements about his observations of defendant's car immediately prior to the traffic stop.

A. Standard of Review

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (People v. Glaser (1995) 11 Cal.4th 354, 362.)

"The trial court, not the reviewing court, 'is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable.' [Citation.] 'The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable.' [Citation.] To reject the statements given by a witness whom the trial court has found credible, either they must be physically impossible or their falsity must be apparent without resorting to inferences or deductions. [Citation.]" (People v. Duncan (2008) 160 Cal.App.4th 1014, 1018.)

The phrase "inherently improbable" means that "the challenged evidence is 'unbelievable per se,' such that 'the things testified to would not seem possible.' [Citation.] The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case." (People v. Ennis (2010) 190 Cal.App.4th 721, 725.)

B. Traffic stops

"The Fourth Amendment's protection against unreasonable searches and seizures dictates that traffic stops must be supported by articulable facts giving rise to a reasonable suspicion that the driver or a passenger has violated the Vehicle Code or some other law. [Citation.]" (People v. Durazo (2004) 124 Cal.App.4th 728, 731.) "A traffic stop is lawful at its inception if it is based on a reasonable suspicion that any traffic violation has occurred, even if it is ultimately determined that no violation did occur. [Citations.]" (Brierton v. Department of Motor Vehicles (2005) 130 Cal.App.4th 499, 510, italics omitted.) Reasonable suspicion requires only that "the detaining officer can point to specific articulable

facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (<u>People v. Souza</u> (1994) 9 Cal.4th 224, 231.)

C. Analysis

Defendant contends he was illegally detained because Officer Kroeker's testimony at the suppression hearing was not credible. Defendant asserts that he was already parked at Sleep Inn when Kroeker initially saw his vehicle, he did not violate any provision of the Vehicle Code, Kroeker lacked reasonable suspicion to conduct any type of traffic stop on his parked vehicle, and his version of the incident was established by the defense witnesses.

As acknowledged by the superior court, the lawfulness of the traffic stop and detention was dependent on a credibility conflict between Officer Kroeker and the defense witnesses. While the evidence could have resulted in different factual findings, we cannot say that no rational trier of fact could have concluded that defendant was not driving on the wrong side of the road or Kroeker's testimony was not credible. As we have explained, the superior court is the exclusive judge of the credibility of witnesses. The court found Kroeker's testimony was credible, there is nothing in the record to suggest his testimony was inherently improbable, and the court's credibility determination may not be disturbed on appeal. (<u>See. e.g.</u>, <u>People v. Ennis</u>, supra, 190 Cal.App.4th at p. 725; <u>People v. Duncan</u>, supra, 160 Cal.App.4th at p. 1018.) While Officer Kroeker may not have observed a particularly serious traffic violation, it was still a violation sufficient to warrant a traffic stop and detention. (<u>See, e.g.</u>, <u>People v. McGaughran</u> (1979) 25 Cal.3d 577, 582, 583 [defendant traveling in wrong direction on a one-way street lawfully stopped]; <u>People v. Jardine</u> (1981) 116 Cal.App.3d 907, 912-913 [officer observed two traffic violations and could stop the van and issue citations: driving left of center after making a turn and throwing an object from the van], disapproved on other grounds in <u>People v. Cooper</u> (1991) 53 Cal.3d 1158, 1167.)

Defendant contends that Officer Kroeker's testimony at the suppression hearing failed to state a violation of Vehicle Code section 21650, and that defendant's alleged driving may have been within one of the statutory exceptions. Vehicle Code section 21650 states that "[u]pon all highways, a vehicle shall be driven upon the right half of the roadway" except for specific exceptions. One of the statutory exceptions is "[w]hen placing a vehicle in a lawful position for, and when the vehicle is lawfully making, a left turn." (Veh. Code, § 21650, subd. (b).)

Defendant argues that while Kroeker claimed to have seen his car driving on the wrong side of the road, defendant may have been preparing to execute a left-hand turn and Kroeker "never testified how far over he believed [defendant's] vehicle crossed into the other side of the roadway or for how long." Defendant thus argues that Kroeker's testimony failed to "negate the possibility that there was a left-hand turn exception," would have entitled defendant to drive on the other side of the road to turn into the parking lot, and Kroeker "failed to provide objective facts upon which to justify a detention for violating Vehicle Code section 21650."

We note that in the civil context, where there is evidence that a

25

party was driving his vehicle on the wrong side of the road in violation of Vehicle Code section 21650, that party has the burden of justifying his position on the highway pursuant to one of the enumerated statutory exceptions. (See, e.g., Parker v. Auschwitz (1935) 7 Cal.App.2d 693, 696; Musgrove v. Zobrist (1947) 83 Cal.App.2d 101, 103-104.) In any event, Officer Kroeker repeatedly testified at the suppression hearing that he conducted the traffic stop because he saw defendant's car driving on the wrong side of the road. Defendant's witnesses claimed defendant's car was already parked at Sleep Inn when the patrol car arrived. While Oxford, defendant's passenger, testified that defendant turned into Sleep Inn's parking lot, she disavowed her previous statement about seeing the patrol car's flashing lights, and she claimed the officers suddenly arrived at defendant's car and there was never a traffic stop. Based on the testimony at the suppression hearing, there was no evidence to raise the possibility that defendant was preparing to make a left turn at the time that Kroeker saw him driving on the wrong side of the road.

Defendant asserts that Officer Kroeker detained him as part of an illegal pretextual stop and an "impermissible ruse" to conduct a general criminal investigation, and not to issue a citation for a Vehicle Code violation. Defendant points to Kroeker's testimony at the suppression hearing, that he had a description of defendant's car and he was looking for him, and argues that defendant was the focus of Santana's investigation and defendant never violated the Vehicle Code.

A traffic stop "is considered 'pretextual' when a law enforcement officer observes or suspects a minor traffic infraction, and uses it to stop the vehicle and search it for evidence even though the officer has no legal basis to suspect the vehicle contains any illegal contraband or the occupants are engaged in any criminal activity. [Citations.]" (People v. Roberts (2010) 184 Cal.App.4th 1149, 1190.) However, an officer's subjective intent or ulterior motive for the vehicle stop is not determinative of its legality. (Whren v. United States (1996) 517 U.S. 806, 812-813; People v. Roberts, supra, 184 Cal.App.4th 1149, 1189.)

As defendant acknowledges, however, the legality of an allegedly pretextual stop was addressed by the United States Supreme Court in Whren v. United States, supra, 517 U.S. 806, where the court held that "a traffic-violation arrest ... [will] not be rendered invalid by the fact that it was 'a mere pretext for a narcotics search,'" and an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (Id. at pp. 812-813; Arkansas v. Sullivan (2001) 532 U.S. 769, 772; see also People v. Ramirez (1997) 59 Cal.App.4th 1548, 1558, fn. 1.) Thus, "[s]topping defendant's vehicle for a seatbelt violation, even if done as a pretext for the narcotics investigation, [is] entirely legal. [Citations.]" (People v. Gomez (2004) 117 Cal.App.4th 531, 537; People v. Roberts, supra, 184 Cal.App.4th 1149, 1191.)

At the suppression hearing, Kroeker admitted he had a description of defendant's car, and he was looking for him. However, there is substantial evidence to support the superior court's finding that Kroeker also saw defendant's car traveling on the wrong side of the road in violation of Vehicle Code section 21650, which provided reasonable cause to conduct the traffic stop in this case. We find that defendant's suppression motion was properly denied.

II. The court's ruling on Officer Kroeker's claim of privilege

As explained in the factual summary, ante, Officer Kroeker refused to answer certain questions at the suppression hearing when defense counsel asked if he was familiar with defendant prior to arresting him that night. Kroeker claimed a privilege pursuant to Evidence Code section 1041, the superior court conducted an in camera hearing, and it upheld Kroeker's claim of privilege.

On appeal, defendant contends the court's ruling on Kroeker's claim of privilege violated his due process right to confront and cross-examine witnesses. Defendant argues the privilege was inapplicable because defense counsel never asked for the identity of any informant, and counsel only asked Kroeker if he was already familiar with defendant and why he was looking for him.

A. Evidence Code sections 1040-1041

Evidence Code section 1040 states that a public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so, and "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice ...." (Evid. Code, § 1040, subd. (b)(2).) "Official information" means "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." (Evid. Code, § 1040, subd. (a).)

Evidence Code section 1041 states:"(a) Except as provided in this section, a public entity has a privilege to refuse to disclose the identity of a person who has furnished information as provided in subdivision (b) purporting to disclose a violation of a law of the United States or of this state or of a public entity in this state, and to prevent another from disclosing such identity, if the privilege is claimed by a person authorized by the public entity to do so ...."

In order to claim the privilege, the court must find that "[d]isclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the identity of the informer be disclosed in the proceeding. In determining whether disclosure of the identity of the informer is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered." (Evid. Code, § 1041, subd. (a)(2).) This privilege applies if the information is furnished in confidence by the informer to a law enforcement officer. (Evid. Code, § 1041, subd. (b)(1).)

B. Analysis

Defendant contends the court's ruling on Kroeker's claim of privilege violated his due process rights during the suppression hearing. However, """there is a fundamental difference between a trial to adjudicate

guilt or innocence and a pretrial hearing to suppress evidence. The due process requirements for a hearing may be less elaborate and demanding than those at the trial proper."' [Citation.] Thus, '"[a] defendant's interest in availing himself of the exclusionary rule may, in exceptional circumstances, be subordinated to safety precautions necessary to encourage citizens to participate in law enforcement."' [Citation.] The 'strong and legitimate interest in protecting the informant's identity' [citation] derives from the need to protect the safety of the informant and the informant's family, the need to preserve the informant's usefulness in current and future investigations, and the need to assure others who are contemplating cooperation with law enforcement of their safety as well. [Citation.]" (People v. Galland (2008) 45 Cal.4th 354, 364-365; see also People v. Martinez (2005) 132 Cal.App.4th 233, 242.)

Our independent review of the entirety of the record reflects the superior court properly conducted an in camera hearing to determine the nature and validity of Kroeker's claim of privilege, and that the court properly upheld Kroeker's claim of privilege under the circumstances. For the same reasons, we also reject defendant's claim that appellate counsel should have been allowed to review the transcript of the in camera portion of the suppression hearing. (See, e.g., People v. Martinez, supra, 132 Cal.App.4th at pp. 241-242.)

We further note that after the superior court upheld Kroeker's claim of privilege, defense counsel continued her cross-examination of Kroeker. He admitted that before he already had defendant's booking photograph that night, he was driving around the parking lot of Econo Lodge and the vicinity of Sleep Inn because he was looking for defendant, and he had a description of defendant's vehicle. When defense counsel asked Kroeker why he was looking for defendant, Kroeker again claimed the privilege and the court upheld Kroeker's claim.

Defendant concedes that defense counsel elicited this information from Kroeker, and further "concedes that any error in permitting Kroeker to exercise a privilege" was harmless. However, defendant argues that his inability to learn why Kroeker was looking for him was prejudicial because the answer was relevant to Kroeker's state of mind and potential bias. Defendant posits that Kroeker could have been following guidelines from the Bakersfield Police Department when he was looking for defendant, if the Bakersfield Police Department had "a departmental policy to pursue and investigate Hispanic drivers who commit minor Vehicle Code violations" near the motels "but ignore minor violations committed by non-Hispanic drivers."

We note that a superior court may uphold an officer's claim of privilege if that claim satisfies the provisions of Evidence Code sections 1040 and 1041. Defendant's theories as to what might have been said during the in camera hearing would not have satisfied the officer's evidentiary burden. Having conducted our independent examination of the confidential portion of the suppression hearing transcript, we are satisfied that the superior court properly upheld Kroeker's claim of privilege pursuant to the provisions of Evidence Code sections 1040 and 1041.

Santana, 2012 Cal. App. Unpub. LEXIS 4073 at 36-53.

1              2.    Analysis

2          To the extent that Petitioner argues that the evidence leading to his arrest was

3    illegally obtained, his claim must fail. A federal district court cannot grant habeas corpus

4    relief on the ground that evidence was obtained by an unconstitutional search and

5    seizure if the state court has provided the petitioner with an "opportunity for full and fair

6    litigation of a Fourth Amendment claim." Stone v. Powell, 428 U.S. 465, 482, 96 S. Ct.

7    3037, 49 L. Ed. 2d 1067 (1976); Moormann v. Schriro, 426 F.3d 1044, 1053 (9th Cir.

8    2005). The only inquiry this Court can make is whether Petitioner had a fair opportunity

9    to litigate his claim, not whether petitioner did litigate nor even whether the court

10   correctly decided the claim. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996);

11   see also, Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding that because Cal.

12   Penal Code § 1538.5 provides opportunity to challenge evidence, dismissal under Stone

13   was necessary even when the petitioner never moved to suppress). Petitioner has not

14   asserted that he lacked an opportunity to present the claim in state court. As the state

15   courts explained on appeal, the trial court held an exhaustive suppression hearing,

16   including hearing testimony from the arresting officer and several defense witnesses.

17   Based on the evidence presented, the court found the arresting officer's testimony more

18   credible. It also found based on evidence presented that there was a traffic violation that

19   served as probable cause for the search. To the extent that the state court denied

20   Petitioner's claim based on admissibility grounds, Petitioner has not shown that he is

21   entitled to federal habeas relief.

22         Petitioner also claims that the prosecution improperly withheld the evidence

23   presented to the arresting officer from a confidential informant based on the California

24   official information privilege. See Cal. Evid. Code §§ 1040-41. To the extent that

25   Petitioner claims that his due process rights were violated by the improper withholding of

26   evidence, his claim fails.

27         "There is no general constitutional right to discovery in a criminal case."

28   Weatherford v. Bursey 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977); see

1   also Wardius v. Oregon, 412 U.S. 470, 474, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1977) ("the

2   Due Process Clause has little to say regarding the amount of discovery which the parties

3   must be afforded"). The prosecution is constitutionally required to disclose only evidence

4   favorable to the accused and material to guilt or punishment. Brady v. Maryland, 373

5   U.S. 83, 87-88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); see Strickler v. Greene, 527

6   U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999) ("There are three

7   components of a true Brady violation: The evidence at issue must be favorable to the

8   accused, either because it is exculpatory, or because it is impeaching; that evidence

9   must have been suppressed by the State, either willfully or inadvertently; and prejudice

10  must have ensued.")

11       Nevertheless, the government has a limited privilege to withhold from disclosure

12  the identity of a confidential informant. Roviaro v. United States, 353 U.S. 53, 59-61, 77

13  S. Ct. 623, 1 L. Ed. 2d 639 (1957). "What is usually referred to as the informer's privilege

14  is in reality the Government's privilege to withhold from disclosure the identity of persons

15  who furnish information of violations of law to officers charged with enforcement of that

16  law." Id. at 59. However, "[w]here the disclosure of an informer's identity is relevant and

17  helpful to the defense of an accused, or is essential to a fair determination of a cause,

18  the privilege must give way." Id. at 60-61. There is no "fixed rule" regarding when

19  disclosure of an informant's identity is required; rather, the public interest in protecting

20  the flow of information must be balanced against the individual's right to prepare his

21  defense. Id. at 62. Whether disclosure is required "depend[s] on the particular

22  circumstances of each case, taking into consideration the crime charged, the possible

23  defenses, the possible significance of the informer's testimony, and other relevant

24  factors." Id. Before the court applies such a balancing test, however, the defendant must

25  show that he has more than a "mere suspicion" that the informant has information which

26  will prove "relevant and helpful," or will be essential to a fair trial. United States v.

27  Amador-Galvan, 9 F.3d 1414, 1417 (9th Cir. 1993).

28       Although Roviaro was not decided "on the basis of constitutional claims," the

30

1  Supreme Court has stated that its subsequent affirmation in <u>McCray v Illinois</u>, 386 U.S.

2  300, 87 S. Ct. 1056, 18 L. Ed. 2d 62 (1967), which included constitutional claims,

3  suggests that "<u>Roviaro</u> would not have been decided differently" if constitutional claims

4  had been presented to the Supreme Court. <u>United States v. Valenzuela-Bernal</u>, 458 U.S.

5  858, 870 (1982).

6      The trial court found that Petitioner was not entitled to disclosure of the

7  confidential informant's identity or information provided by the informant because he had

8  not made a sufficient showing that the information was helpful to his defense. Petitioner

9  contends that his showing was sufficient because the information from the informant was

10  relevant to the arresting officer's state of mind and potential bias. However, the Court

11  determined that the officer's testimony regarding the traffic violation committed by

12  Petitioner to be credible. As such, the officer was able to conduct a traffic stop based on

13  "probable cause … that a traffic violation has occurred." <u>Whren v. United States</u>, 517

14  U.S. 806, 810, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). "The fact that the alleged traffic

15  violation is a pretext for the stop is irrelevant, so long as the objective circumstances

16  justify the stop." <u>United States v. Wallace</u>, 213 F.3d 1216, 1219 (9th Cir. 2000). As the

17  officer's subjective reasons for initiating the stop are not relevant, the trial court's

18  decision to uphold the privilege was appropriate. The information withheld would not

19  have assisted Petitioner in his motion to suppress, which hinged on the court's

20  determination that there was probable cause to initiate an arrest, even if pretextual.

21      Furthermore, any alleged error was harmless. Despite the trial court upholding the

22  privilege, trial counsel elicited testimony from the officer that he was looking for

23  Petitioner, and had viewed Petitioner's photo on file, had a description of Petitioner's

24  vehicle and was driving in the area searching for Petitioner. Accordingly, Petitioner's

25  counsel was effective in presenting to the court evidence of the officer's potential lack of

26  credibility during the suppression hearing.

27      Thus, Petitioner has not shown more than a "mere suspicion" that the informant

28  had "relevant and helpful" information, or had information essential to a fair trial.

1   Amador-Galvan, 9 F.3d at 1417; see Roviaro, 353 U.S. at 62. In Roviaro, the Supreme

2   Court found that the defendant was entitled to disclosure of the informant's identity

3   because the informant was a participant in the narcotics transaction giving rise to the

4   criminal charges. The informant was the only witness to the transaction other than the

5   defendant, and thus the only person who could contradict the testimony of government

6   witnesses. In addition, there was testimony that at one time the informant denied

7   knowing the defendant or having seen him before. Id., 353 U.S. at 63-65. Here,

8   Petitioner presented no evidence that the informant, or the information provided by the

9   informant, related in any way to the motor violation that provided probable cause for the

10  stop.

11      The prosecution's failure to identify the confidential informant did not violate

12  Brady. As discussed above, the trial court ruled that the prosecution could withhold the

13  information, and the trial court's ruling comported with the Supreme Court's analysis in

14  Roviaro. Moreover, Petitioner has not shown that the informant would have provided

15  favorable evidence, or that he was prejudiced by the nondisclosure. See Strickler, 527

16  U.S. at 281-82. There was no Brady or Roviaro violation.

17      In his traverse, Petitioner also argues that the trial court's refusal to order

18  disclosure of the informant's identity violated his Sixth Amendment rights under

19  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984),

20  because it prevented trial counsel from carrying out an adequate investigation. (Traverse

21  at 21-22.) The claim is without merit. Petitioner did not make a sufficient showing to be

22  entitled to disclosure of the informant's identity under Roviaro. Further counsel elicited

23  testimony from the officer that he was in possession of critical information regarding

24  Petitioner, inferring that the officer had consulted with an informant prior to the arrest. To

25  the extent such information was relevant to the court's determination of the officer's

26  credibility at the suppression hearing, counsel adequately presented the testimony to the

27  court. Petitioner has not made a showing that counsel's performance was deficient.

28      For the reasons stated, Petitioner has not shown that the trial court's refusal to

order the prosecution to disclose the identity of the confidential informant violated his constitutional rights, that his right to disclosure under <u>Brady</u> was violated, or that counsel was ineffective.

The California Court of Appeal decision denying this claim was not contrary to clearly established Supreme Court precedent. Accordingly, Petitioner is not entitled to habeas relief.

**B.    <u>Claims Two and Three – Denial of Motion to Withdraw Plea</u>**

Petitioner, in his second and third claims, contends that the state court's denial of his motion to withdraw his plea violated his due process rights, and that counsel was ineffective for failing to argue adequate grounds at the hearing on the motion to withdraw the plea. (Am. Pet. at 7.)

1.    <u>State Court Decision</u>

Petitioner presented his claims in his direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the Court of Appeal and summarily denied in subsequent petition for review by the California Supreme Court. (<u>See</u> Lodged Docs. 3, 5.) Since the California Supreme Court denied the petition in a summary manner, this Court "looks through" the decisions and presumes the Supreme Court adopted the reasoning of the Court of Appeal, the last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 804-05 & n.3 (1991).

In denying Petitioner's claims, the Court of Appeal explained that:

IV. Defendant's request to withdraw his plea

Defendant next contends the sentencing court improperly refused to consider his statement that he wanted to withdraw his plea. Defendant complains the court should not have demanded defense counsel to articulate a legal basis for a motion to withdraw, and the court failed to allow counsel the appropriate time to investigate several matters which should have been raised in a motion to withdraw.

A. Motions to withdraw

A defendant may move to withdraw his plea, at any time before judgment, on a showing of good cause. (§ 1018.) "To establish good

1  cause, it must be shown that defendant was operating under mistake,
   ignorance, or any other factor overcoming the exercise of his free
2  judgment. [Citations.] Other factors overcoming defendant's free judgment
   include inadvertence, fraud or duress. [Citations.] However, '[a] plea may
3  not be withdrawn simply because the defendant has changed his mind.'
   [Citations.]" (People v. Huricks (1995) 32 Cal.App.4th 1201, 1208.)
4  "Postplea apprehension (buyer's remorse) regarding the anticipated
   sentence, even if it occurs well before sentencing, is not sufficient to
5  compel the exercise of judicial discretion to permit withdrawal of the plea
   of guilty. [Citation.]" (People v. Knight (1987) 194 Cal.App.3d 337, 344.)

6      "Although criminal defendants are entitled to competent
   representation in the presentation of a motion to withdraw a plea,
7  appointed counsel may properly decline to bring a meritless motion.
   [Citations.]" (People v. Brown (2009) 175 Cal.App.4th 1469, 1473, citing
8  People v. Smith (1993) 6 Cal.4th 684, 695-696.)

9  B. Analysis

10     Defendant argues the sentencing court improperly imposed a
   "limitation" on Mr. Revelo, when it asked him to articulate the basis for a
11  new trial motion. Defendant asserts his right to counsel was violated
   because the court prevented Mr. Revelo from having time "to thoroughly
12  investigate the possible grounds upon which a motion might be brought."

13     Defendant concedes that Mr. Revelo never asked the court for
   more time to investigate a motion to withdraw his plea, but argues that it
14  would have been futile for him to do so, based on the court's comments.
   Defendant argues the court's demand for an articulated ground prevented
15  Mr. Revelo from conducting a thorough investigation into the possible
   reasons to support a motion to withdraw his plea.
16
       Contrary to defendant's characterization of the exchange, the
17  sentencing court did not improperly ask Mr. Revelo to state the basis for a
   motion to withdraw the plea. The court did not make any comments that
18  would have led Mr. Revelo to believe that it would have been futile for him
   to ask for a continuance to further investigate a possible motion to
19  withdraw defendant's plea. After defendant retained Mr. Revelo, the court
   continued the sentencing hearing for one month. It was reasonable for the
20  court to presume that Mr. Revelo would have considered any appropriate
   post-verdict motions during that time. When the court finally convened the
21  sentencing hearing, Mr. Revelo advised the court that he just learned that
   defendant wanted to withdraw his plea because of "the number of years
22  he's getting as a sentence," but he did not know the specific reason. While
   the court reminded Mr. Revelo of the plea agreement, it immediately
23  ordered a recess so Mr. Revelo could talk with defendant. After the
   recess, Mr. Revelo advised the court that there was no legal basis for a
24  motion to withdraw.

25     The sentencing court did not make any comments which would
   have limited defendant's right to effective assistance of counsel, or led Mr.
26  Revelo to believe that he could not have requested a continuance to
   further investigate a possible meritorious motion to withdraw the pleas.
27  Instead, the record suggests that Mr. Revelo discussed the matter with
   defendant and decided there was no valid basis to pursue such a motion.
28  It is well settled that trial counsel is not required to make tactical decisions,

undertake futile acts, or file meritless motions simply to withstand later claims of ineffective assistance. (People v. Anderson (2001) 25 Cal.4th 543, 587; People v. Hines (1997) 15 Cal.4th 997, 1038, fn. 5.)

V. The court's alleged duties at the sentencing hearing

Defendant raises a further issue regarding the sentencing court's exchange with Mr. Revelo prior to the imposition of sentence. When Mr. Revelo advised the court that there was no legal basis to file a motion to withdraw, defendant asserts the sentencing court had certain constitutional and statutory duties to review Mr. Revelo's decision not to file a motion to withdraw defendant's pleas and admissions. Defendant further argues the court was required to exercise its independent judgment to determine whether defendant received effective assistance of counsel as to all matters that occurred prior to the sentencing hearing, and conduct a Marsden-type inquiry to determine if there was a valid reason for a motion to withdraw the plea based on the ineffective assistance of any of defendant's prior attorneys.

A. Eastman and Mendez

Defendant's arguments are based on a series of cases from this court, which held that when a defendant seeks a new trial based on his or her trial attorney's alleged incompetence, a trial court's duty to conduct a Marsden inquiry is triggered. (People v. Mendez (2008) 161 Cal.App.4th 1362, 1366-1367 (Mendez); People v. Eastman (2007) 146 Cal.App.4th 688 (Eastman), cf. People v. Richardson (2009) 171 Cal.App.4th 479, 484-485.)

Marsden imposes four requirements on a trial court under certain circumstances. (Mendez, supra, 161 Cal.App.4th at pp. 1367-1368.) "First, if 'defendant complains about the adequacy of appointed counsel,' the trial court has the duty to 'permit [him or her] to articulate his [or her] causes of dissatisfaction and, if any of them suggest ineffective assistance, to conduct an inquiry sufficient to ascertain whether counsel is in fact rendering effective assistance.' [Citations.]" (Id. at p. 1367, italics in original.) "Second, if a 'defendant states facts sufficient to raise a question about counsel's effectiveness,' the trial court has a duty to 'question counsel as necessary to ascertain their veracity.' [Citation.]" (Id. at p. 1368, italics in original.) "Third, the trial court has the duty to 'make a record sufficient to show the nature of [a defendant]'s grievances and the court's response to them.' [Citation.]" (Ibid., italics in original.) "Fourth, the trial court must '"allow the defendant to express any specific complaints about the attorney and the attorney to respond accordingly."' [Citation.]" (Ibid., italics in original.)

In People v. Brown (1986) 179 Cal.App.3d 207 (Brown), the defendant's attorney informed the court at sentencing that the defendant wanted to withdraw his plea, but that in her opinion, there was no "legal basis" for such a motion, and she was not making the motion for him. (Id. at p. 211.) The defendant told the court that at the time he entered his plea, he "'wasn't in the right frame of mind'" because "'a death ... had [him] shook up.'" (Id. at pp. 211 and 213.) The defendant asked the trial court if he could withdraw his plea and obtain another attorney, but the trial court refused to grant either request. (Id. at pp. 211-213.)

Brown held the defendant was deprived of his right to make an effective motion to withdraw his plea. (Brown, supra, 179 Cal.App.3d at pp. 213-214.) Brown remanded the case to allow the defendant, represented by counsel, to move to withdraw his plea, with instructions for a Marsden hearing should counsel continue to refuse to bring the motion. In doing so, Brown clarified that it was not suggesting that counsel was required to make a frivolous motion or "compromise accepted ethical standards." (Id. at p. 216.)

In People v. Osorio (1987) 194 Cal.App.3d 183 (disapproved on other grounds in People v. Johnson (2009) 47 Cal.4th 668), the defendant stated at sentencing that he wanted to withdraw his plea because "'he didn't understand what he was pleading to.'" (Id. at p. 186.) Trial counsel represented to the court that there appeared to be good grounds for a motion to withdraw the plea but refused, "'in good conscience,'" to bring the motion because withdrawal of the plea would result in reinstatement of additional counts. (Id. at p. 188.)

Osorio relied on Brown and held that "counsel's representation to the court that there was a colorable basis for the motion to withdraw the guilty plea requires a similar disposition of the present appeal." (Osorio, supra, 194 Cal.App.3d at p. 189.) Osorio remanded the case to allow defendant to bring a motion to withdraw the plea. (Ibid.)

In People v. Eastman, supra, 146 Cal.App.4th 688, the defendant entered a negotiated plea of no contest to two counts of lewd acts on a child. At sentencing, defense counsel informed the trial court that the defendant wanted to withdraw his plea and asked the trial court to appoint substitute counsel to investigate whether a factual or legal basis existed for the defendant to do so. (Id. at p. 690.) The trial court also received a letter written by the defendant's mother, that defense counsel lied to the defendant so he would agree to the plea. (Id. at p. 691.) The court appointed a new attorney, and he subsequently stated he would not file a motion to withdraw the plea because his investigation did not disclose any grounds to do so. Defendant's first attorney then resumed his representation of the defendant. (Id. at pp. 692-693.)

Eastman held the court should have held a Marsden hearing to address defendant's complaints about his appointed counsel. (Eastman, supra, 146 Cal.App.4th at p. 691.) Eastman held that by failing to hold a Marsden hearing, the trial court denied the defendant the opportunity to state his complaints about defense counsel on the record and failed to discharge its duty of inquiry under Marsden. (Id. at pp. 696-697.) Eastman further held the failure to hold a Marsden hearing required a conditional reversal. (Id. at pp. 691, 697-698.)

"Marsden and its progeny require that when a defendant complains about the adequacy of appointed counsel, the trial court permit the defendant to articulate his causes of dissatisfaction and, if any of them suggest ineffective assistance, to conduct an inquiry sufficient to ascertain whether counsel is in fact rendering effective assistance. [Citations.] If the defendant states facts sufficient to raise a question about counsel's effectiveness, the court must question counsel as necessary to ascertain their veracity. [Citations.]" (Eastman, supra, 146 Cal.App.4th at p. 695.)

In People v. Sanchez (2011) 53 Cal.4th 80 (Sanchez), however, the California Supreme Court recently limited this court's interpretation of Eastman and Mendez, and clarified that the "'the trial court's duty to conduct a Marsden hearing [is] triggered by defense counsel's request for appointment of substitute counsel to investigate the filing of a motion to withdraw [the] plea on [defendant's] behalf.'" (Id. at p. 90, fn. 3.)

"We conclude that a trial court is obligated to conduct a Marsden hearing on whether to discharge counsel for all purposes and appoint new counsel when a criminal defendant indicates after conviction a desire to withdraw his plea on the ground that his current counsel provided ineffective assistance only when there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney.' [Citation.]  We additionally hold that, at any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to our holding in Marsden, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney. [Citation.] In turn, if the defendant makes a showing during a Marsden hearing that his right to counsel has been 'substantially impaired' [citation], substitute counsel must be appointed as attorney of record for all purposes. [Citation.] In so holding, we specifically disapprove of the procedure adopted by the trial court in this case, namely, the appointment of a substitute or 'conflict' attorney solely to evaluate whether a criminal defendant has a legal ground on which to move to withdraw the plea on the basis of the current counsel's incompetence." (Sanchez, supra, 53 Cal.4th at pp. 89-90, fn. omitted.)

In reaching this holding, Sanchez criticized Eastman and Mendez because they "incorrectly implied that a Marsden motion can be triggered with something less than a clear indication by a defendant, either personally or through current counsel, that the defendant 'wants a substitute attorney.' [Citation.]" (Sanchez, supra, 53 Cal.4th at p.90, fn. 3.)

B. Analysis

Defendant contends the sentencing court had the duty to conduct the inquiries explained in Eastman and the other cases, based on defendant's statement that he wanted to withdraw his plea, and Mr. Revelo's subsequent statement that there was no legal basis to make the motion. There are several problems with defendant's argument.

First, Eastman, Mendez, Brown, and Osorio are based on the court's responsibilities under Marsden when a defendant expresses dissatisfaction with his appointed defense attorney. The requirements of a Marsden hearing, however, do not apply to cases where defense counsel has been privately retained by the defendant. (People v. Ortiz (1990) 51 Cal.3d 975, 986; People v. Lara (2001) 86 Cal.App.4th 139, 152.)

At the time of the sentencing hearing, defendant was represented by Mr. Revelo, his retained attorney. If defendant wanted to discharge Mr.

Revelo, he was not required to make a <u>Marsden</u> motion, and the trial court had discretion to grant a motion to discharge retained counsel under certain circumstances. (<u>People v. Lara</u>, supra, 86 Cal.App.4th at p. 155.) However, defendant gave no indication, either expressed or implied, that he was dissatisfied with Mr. Revelo, he wanted to discharge or replace him, or he wanted another attorney appointed to represent him.

Second, even if <u>Eastman</u> and the other cases applied to a situation where defendant was represented by retained counsel, defendant never advised the sentencing court that he had specific complaints against Mr. Revelo or his prior defense attorneys, or that Mr. Revelo refused to file a non-frivolous motion to withdraw his pleas and admissions. In <u>Brown</u>, defendant told the court that he was not in the "'right frame of mind'" when he entered his plea. (<u>Brown</u>, supra, 179 Cal.App.3d at p. 211.) In <u>Osorio</u>, defendant stated that he "'didn't understand what he was pleading do.'" (<u>Osorio</u>, supra, 194 Cal.App.3d at p. 186.) In <u>Eastman</u>, defense counsel asked the court to investigate possible grounds for a motion to withdraw, and the defendant's mother presented the court with a letter about counsel's alleged lies and inducements to get the defendant to accept the plea agreement. (<u>Eastman</u>, supra, 146 Cal.App.4th at pp. 960-961.)

In contrast, the defendant in this case never addressed the court, he never expressed any dissatisfaction with Mr. Revelo or any of his prior attorneys, he never asked for another attorney to represent him or investigate a possible motion to withdraw, and his attorney never asked the court to investigate the situation. Defendant's alleged dissatisfaction with his sentence was more consistent with "[p]ostplea apprehension (buyer's remorse) regarding the anticipated sentence" which is "not sufficient to compel the exercise of judicial discretion to permit withdrawal of the plea of guilty. [Citation.]" (<u>People v. Knight</u>, supra, 194 Cal.App.3d at p. 344.)

We thus conclude that even if <u>Eastman</u> and the other cases apply to a case where a defendant is represented by retained counsel, the sentencing court was not presented with any type of situation to trigger a <u>Marsden</u>-type of inquiry anticipated by <u>Eastman</u> and <u>Mendez</u>.

<u>Santana</u>, 2012 Cal. App. Unpub. LEXIS 4073 at 58-71.

        2.        Applicable Legal Authority and Analysis

Based on the sequence of events described by the state court Petitioner presents two alternate claims. First, Petitioner contends that the state court violated his due process by not providing defense counsel adequate time to investigate and prepare arguments in support of Petitioner's motion to withdraw his plea. Second, Petitioner argues that counsel was ineffective in not presenting a sufficient argument to support the motion to withdraw.

        a.        Trial Court's Limitation on Time to Present Motion

In his state appeals, Petitioner argues that state law dictates that when a

1  defendant seeks a new trial based on his attorney's alleged incompetence, the trial court

2  is compelled to conduct a <u>Marsden</u> hearing regarding the competency of counsel's

3  representation. <u>See</u> <u>People v. Sanchez</u>, 53 Cal. 4th 80, 90 n.3 (2011). Even if such a

4  right exists under state law, Petitioner's claim fails.

5       First, the relief sought in the present petition is not cognizable under federal

6  habeas corpus. Federal habeas relief is available only to state prisoners who are "in

7  custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

8  §§ 2241(c)(3), 2254(a). "In conducting habeas review, a federal court is limited to

9  deciding whether a conviction violated the Constitution, laws, or treaties of the United

10 States." <u>Estelle v. McGuire</u>, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991);

11 <u>see also</u> <u>Swarthout v. Cooke</u>, 562 U.S. 216, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732

12 (2011) (per curiam) ("We have stated many times that federal habeas corpus relief does

13 not lie for errors of state law."). Accordingly, to the extent this claim challenges only the

14 trial court's application of state law, or alleges that the trial court abused its discretion,

15 such a claim does not set forth a cognizable ground for habeas corpus relief. <u>See</u>

16 <u>Williams v. Borg</u>, 139 F.3d 737, 740 (9th Cir. 1998) (Federal habeas relief is available

17 "only for constitutional violation, not for abuse of discretion.").

18      Assuming that the trial court had a duty to determine if Petitioner's counsel was

19 acting competently but failed to do so, Petitioner does not explain how the court's failure

20 violated his due process rights. Under California law, a trial court only has a duty to

21 conduct a <u>Marsden</u> hearing after a plea if the defendant clearly indicates that he wants

22 substitute counsel. <u>People v. Sanchez</u>, 53 Cal. 4th 80 at  89. While Petitioner indicated

23 to the trial court that he wanted to withdraw his plea, he never indicated that the basis

24 was incompetence of counsel or that he wanted substitute counsel. Moreover, at the

25 time that he moved to withdraw his plea, he was represented by retained counsel, and

26 never attempted to fire counsel and seek the appointment of counsel by the court.

27      The Sixth Amendment entitles a criminal defendant to an attorney who

28 "'function[s] in the active role of an advocate.'" <u>Plumlee v. Masto</u>, 512 F.3d 1204, 1211

1 (9th Cir. 2008) (en banc) (quoting Entsminger v. Iowa, 386 U.S. 748, 751, 87 S. Ct.

2 1402, 18 L. Ed. 2d 501 (1967)). The right to counsel does not guarantee a "meaningful

3 attorney-client relationship," Morris v. Slappy, 461 U.S. 1, 13-14, 103 S. Ct. 1610, 75 L.

4 Ed. 2d 610 (1983), and an indigent defendant is not entitled to appointed counsel of his

5 or her choice. See United States v. Gonzalez-Lopez, 548 U.S. 140, 151, 126 S. Ct.

6 2557, 165 L. Ed. 2d 409 (2006); Schell v. Witek, 218 F.3d 1017, 1025-26 (9th Cir. 2000)

7 ("The qualified right of choice of counsel applies only to persons who can afford to retain

8 counsel."). Nonetheless, a trial court faced with a motion to substitute appointed counsel

9 must make an appropriate inquiry on the record and resolve the motion on the merits

10 before moving forward. Schell, 218 F.3d at 1025. If the defendant and his counsel have

11 become "embroiled in irreconcilable conflict" such that continued representation falls

12 short of what is guaranteed by the Sixth Amendment, substitute counsel should be

13 appointed. Id. (quoting Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970)); see also

14 Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) ("[Forcing a defendant to go to

15 trial with an attorney with whom he has an irreconcilable conflict amounts to constructive

16 denial of the [] right to counsel.").

17     As Petitioner was represented by privately represented counsel, and never

18 expressed to the trial court dissatisfaction with counsel, the court had no reason to

19 inquire into whether Petitioner was adequately represented. Nor did the trial court deny

20 Petitioner appropriate due process in providing little time to present argument on the

21 motion to withdraw the plea. Counsel never requested additional time to investigate the

22 matter, and instead withdrew the request. Regardless, Petitioner has not shown that the

23 procedural errors of the trial court "violated the Constitution, laws, or treaties of the

24 United States." Estelle v. McGuire, 502 U.S. at 67-68. The trial court provided Petitioner

25 opportunities to present his motion to withdraw, and to the extent that the actions of the

26 court were inadequate, Petitioner has not provided any federal authority to support the

27 finding that his federal rights were violated.

28     Petitioner has not shown that the state court was unreasonable in denying his

1  claims that the trial court violated his rights in failing to investigate the competency of

2  counsel or provide Petitioner additional time to present his motion to withdraw his plea.

3  The state court's rejection of the claim was not contrary to, or an unreasonable

4  application of, clearly established Supreme Court precedent, or involved an

5  unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Petitioner is not

6  entitled to federal habeas relief on this claim.

7     Likewise, Petitioner has not shown that the conduct of counsel was ineffective.

8  Providing the state court decisions with appropriate deference for Petitioner's

9  contentions, there is at least a possibility that fair-minded jurists could agree with the

10 state court decision that Petitioner was not prejudiced by counsel's conduct.

11    The law governing ineffective assistance of counsel claims is clearly established

12 for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).

13 Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998). In a petition for writ of habeas

14 corpus alleging ineffective assistance of counsel, the Court must consider two factors.

15 Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry

16 v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's

17 performance was deficient, requiring a showing that counsel made errors so serious that

18 he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

19 Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell

20 below an objective standard of reasonableness, and must identify counsel's alleged acts

21 or omissions that were not the result of reasonable professional judgment considering

22 the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

23 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court

24 indulges a strong presumption that counsel's conduct falls within the wide range of

25 reasonable professional assistance. Strickland, 466 U.S. at 687; see also, Harrington v.

26 Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

27    Second, the petitioner must demonstrate that "there is a reasonable probability

28 that, but for counsel's unprofessional errors, the result ... would have been different,"

41

1   Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so

2   egregious as to deprive defendant of a fair trial, one whose result is reliable. Id. at 687.

3   The Court must evaluate whether the entire trial was fundamentally unfair or unreliable

4   because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1348; United

5   States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

6        To demonstrate ineffective assistance of counsel in the context of a challenge to a

7   guilty plea, a habeas petitioner must show both that counsel's advice fell below an

8   objective standard of reasonableness as well as a "reasonable probability" that, but for

9   counsel's errors, the petitioner would not have pleaded guilty and would have insisted on

10  going to trial. Hill v. Lockhart, 474 U.S. at 58-59 (holding that the two-part test of

11  Strickland v. Washington applies to challenges to guilty pleas based on the ineffective

12  assistance of counsel); Missouri v. Frye,    U.S.   , 132 S.Ct. 1399, 1405, 182 L. Ed. 2d

13  379 (2012) (reaffirming that Hill is properly applied to claims of ineffective assistance of

14  counsel in the context of acceptance of a plea bargain); Padilla v. Kentucky, 559 U.S.

15  356, 130 S.Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010) (stating that to obtain relief on this

16  type of claim, a petitioner must convince the court that a decision to reject the plea

17  bargain would have been rational under the circumstances).

18       As the state court reasonably found, Petitioner never expressed dissatisfaction

19  with the representation of his attorney at the time of his motion to withdraw or with the

20  prior attorneys who had represented him during the plea bargain process. In his federal

21  petition Petitioner argues that he told counsel at the time of the motion to withdraw the

22  plea that there were new witnesses and that Petitioner could retrieve new evidence.

23  (Am. Pet. at 7.) Even if Petitioner discussed such matters with counsel, the state court's

24  determination that counsel's decision not to present a meritless motion with the court is

25  not an unreasonable determination of federal law.

26       In light of the doubly deferential standard on federal habeas review, it is not

27  possible to find that the state court decision was unreasonable. While Petitioner asserts

28  that he provided counsel potential new information to support a motion to withdraw the

1  plea, the state court found that even with that information, counsel did not fall below the

2  norms of professional conduct in determining that petitioner did not have a valid basis to

3  move to withdraw the plea.

4      Petitioner has not met his burden of showing that there was a "reasonable

5  probability that... the result ... would have been different." Strickland, 466 U.S. at 694.

6  Fairminded jurists could therefore disagree with the correctness of the state court

7  decision that counsel's failure to present arguments in support of Petitioner's motion to

8  withdraw his plea was reasonable. Petitioner's claim of ineffective assistance of counsel

9  claim is without merit.

10      Accordingly, the state court adjudication of the claim did not result in a decision

11  that was contrary to, or involved an unreasonable application of, clearly established

12  Federal law, or result in a decision that was based on an unreasonable determination of

13  the facts in light of the evidence. 28 U.S.C. § 2254(d). Petitioner is not entitled to relief.

14  **V.**   **CONCLUSION**

15      Petitioner is not entitled to relief with regard to the claims presented in the instant

16  petition. The Court therefore orders that the petition be DENIED.

17  **VI.**   **CERTIFICATE OF APPEALABILITY**

18      A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

19  appeal a district court's denial of his petition, and an appeal is only allowed in certain

20  circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). The controlling statute

21  in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which

22  provides as follows:

23        (a) In a habeas corpus proceeding or a proceeding under section 2255
      before a district judge, the final order shall be subject to review, on appeal,
24        by the court of appeals for the circuit in which the proceeding is held.

25        (b) There shall be no right of appeal from a final order in a proceeding to
      test the validity of a warrant to remove to another district or place for
26        commitment or trial a person charged with a criminal offense against the
      United States, or to test the validity of such person's detention pending
27        removal proceedings.

28        (c)    (1) Unless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken to the court of appeals from–

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B) the final order in a proceeding under section 2255.

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 537 U.S. at 338.

In the present case, the Court finds that no reasonable jurist would find the Court's determination that Petitioner is not entitled to federal habeas corpus relief wrong or debatable, nor would a reasonable jurist find Petitioner deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

///

///

///

///

///

///

**VII.**     **ORDER**

Accordingly, IT IS HEREBY ORDERED:

1) The petition for writ of habeas corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment and close the case; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:     August 4, 2015                    /s/ *Michael J. Seng*
UNITED STATES MAGISTRATE JUDGE

45